[Civ. No. 54730. Second Dist., Div. Two. Aug. 10, 1979.]

THRIFTY DRUG STORES, INC., Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and
RUFINA KAYE, Respondents.

**Counsel**

Bralley, Bentley & Dickinson, William G. Lorenzetti and Maurice W. Bralley, Jr., for Petitioner.

Schwartz, Steinsapir, Dohrmann & Krepack, Mark Edelstein and Steven M. Barry for Respondents.

Kathe R. Moore as Amicus Curiae on behalf of Respondents.

**Opinion**

**COMPTON, J.**—The Workers' Compensation Appeals Board (the Board) in an order denying reconsideration, affirmed a temporary disability rate for an injured employee which was adjusted to reflect postinjury salary increases provided under a collective bargaining agreement between Thrifty Drug Stores, Inc. (Thrifty) and the Retail Clerks' Labor Union (Union) of which the injured worker was a member. We affirm the award.

Rufina Kaye, the injured worker while employed by Thrifty as a retail clerk on March 22, 1971, sustained injury to her back arising out of and occurring in the course of her employment.

On the date of injury, Kaye's earnings were $131.20 per week, which would result in a temporary disability rate of $81.02. The above

mentioned union contract provided for wage increases for Union members in the form of increments in the hourly wage. Under the Union contract Kaye's weekly earnings would have increased in July 1971 to $138, which would result in a temporary disability rate of $86.22, and in July 1972 her weekly earnings would have increased so that the temporary disability rate would have been increased to $87.50, the maximum temporary disability rate.

The workers' compensation judge awarded Kaye temporary disability for the periods of May 25, 1971, to and including June 27, 1971, at $81.02 per week; July 25, 1971, to and including June 30, 1972, at $86.22 per week; and July 1, 1972, to and including January 25, 1976, at $87.50 per week. Thus, the temporary disability rate was adjusted to reflect the wage increases Kaye would have received under the Union contract had she not been injured.[1]

These figures are computed on the basis of statutory formula derived by application of Labor Code sections 4453 and 4653.[2]

Section 4453 provided at the time of injury in pertinent part: "In computing average annual earnings for the purposes of temporary disability indemnity only, the average weekly earnings shall be taken at not less than thirty-eight dollars and forty-six cents ($38.46) nor more than one hundred thirty-four dollars and sixty-two cents ($134.62). In computing average annual earnings for purposes of permanent disability indemnity, the average weekly earnings shall be taken at not less than thirty dollars and seventy-seven cents ($30.77) nor more than eighty dollars and seventy-seven cents ($80.77). Between these limits the average weekly earnings, except as provided in Sections 4456 to 4459, shall be arrived at as follows: (a) *Where the employment is for 30 or more hours a week for five or more working days a week, the average weekly earnings shall be 95 percent of the number of working days a week times the daily earnings at the time of the injury.*" (Italics added.)

Section 4653 provided in part, at the time relating to this matter, "If the injury causes temporary total disability, the disability payment is sixty-

---

[1]Any adjustments to Kaye's earnings have no effect here on her *permanent* disability rate as Kaye was already at maximum earnings for permanent disability at the time of injury. (§§ 4453, 4460.)

[2]All further references to code sections shall refer to the Labor Code unless otherwise indicated.

five percent of the *average weekly earnings* during the period of such disability. . . ." (Italics added.)

Thus, sections 4453 and 4653 set the total temporary disability rate as 65 percent of 95 percent of Kaye's weekly earnings subject to the minimum and maximum limits set forth in section 4453. (See 1 Herlick, Cal. Workers' Compensation Law Handbook (2d ed. 1978) §§ 5.23, 6.7.)

■ At issue is the method of computing Kaye's *average weekly earnings.* Thrifty argues that since Kaye was a permanent full-time employee working more than 30 hours a week, 5 days a week, subdivision (a) of section 4453 limits the base earnings figure to that actually being received at the time of the injury.

Subdivision (d) of that statute, however, provides: "Where the employment is for less than 30 hours per week, *or where for any reason the foregoing methods of arriving at the average weekly earnings cannot reasonably and fairly be applied,* the average weekly earnings shall be taken at 95 percent of the sum which reasonably represents the average *weekly earning capacity* of the injured employee at the time of his injury, due consideration being given to his actual earnings from all sources and employments." (Italics added.)

It is to be noted that while both subdivision (a) and (d) have the common objective of determining "average weekly earnings," subdivision (a) reaches that objective on the basis of *actual earnings,* while subdivision (d) speaks of "earning capacity."

Workers' compensation awards generally are designed to cover a loss of earning capacity. As was stated in *West* v. *Industrial Acc. Com.,* 79 Cal.App.2d 711, at page 722 [180 P.2d 972], "By 'Average Earnings' nothing more is meant than earning capacity. . . . Consequently the various statutory methods of computation of average weekly earnings . . . possess validity only to the extent they truly reflect actual *earning capacity at the time of injury.*" (Italics added.)

Later in *Goytia* v. *Workmen's Comp. App. Bd.,* 1 Cal.3d 889 [83 Cal.Rptr. 591, 464 P.2d 47], the Supreme Court held that "earning capacity" could be reflected in post, as well as preinjury earnings. It was there held at page 894: "Earning capacity is not locked into a straitjacket of the actual earnings of the worker at the date of the injury; . . . the term

envisages a dynamic, not a static, test and cannot be compressed into earnings at a given moment of time."

The *West* case involved a practical nurse who received a salary plus room and board. She was injured during the first week of employment. An award based on fulltime employment at that rate of pay was annulled and the Board was directed to consider her past earning history which had been spasmodic.

On the other hand, *Goytia* involved a seasonal worker with minimal earnings at the time of injury. Subsequently, she obtained fulltime employment with higher earnings. Under these circumstances the Supreme Court concluded that postinjury earnings should be considered in determining "earning capacity" under subdivision (d).

Neither *Goytia* nor *West* dealt squarely with the two questions raised by the facts of the case at bench. Those questions are (1) can there be circumstances in which *actual earnings* of a fulltime employee at the time of injury do not fairly and reasonably represent *earning capacity*?, and if so, (2) can raises, not actually received but which would have been but for the worker's disability, be considered in determining earning capacity?

Turning first to the issue of postinjury raises, the only prior case to face this precise question is the appeals board's decision in *Moreno* v. *WCAB*, 39 Cal.Comp.Cases 109.[3] In *Moreno*, the parties stipulated that one year after the injury the injured would have received a 7 percent wage increase and the next year an 8 percent wage increase. The appeals board held that the temporary disability rate was properly determined based upon actual earnings at the date of injury and that the rate need not be adjusted upward to reflect wage increases the employee would have received had she not been injured. Respondents, however, urge that *Moreno* is either distinguishable or is questionable in light of appellate authority.

---

[3]The Court of Appeal, First Appellate District, denied a writ of review and the Supreme Court denied a hearing in *Moreno*. The appeals board's decision in *Moreno* is, of course, not binding on this court in the present matter. Further, the denial of review by the appellate courts of an appeals board decision does "not necessarily indicate the appellate court's agreement with the board's decision regarding the issues presented." (*Kaiser Foundation Hospitals* v. *Workers' Comp. Appeals Bd. (Gregory)* 87 Cal.App.3d 336, 347 [151 Cal.Rptr. 368].)

Legal authorities are not in clear agreement on the consideration of postinjury wage increases in setting the compensation rate. Hanna suggests that postinjury wage increases should not be considered "except under special circumstances as where the pay increase was under consideration at the time of injury and was granted retroactively to the date of injury." (2 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d rev.ed. 1979) § 12.02[5].) On the other hand, Herlick indicates that postinjury wage increases might be considered. (See 1 Herlick (2d ed. 1978) *supra*, § 5.13.) Professor Larson indicates the better view is that postinjury increases be considered in setting compensation rates. (2 Larson, Workmen's Compensation Law (1976) §§ 57.20-57.53.)

The reverse "side of the coin" was exhibited in *West v. Industrial Acc. Com., supra.* Similarly, in *Argonaut Ins. Co. v. Industrial Acc. Com.,* 57 Cal.2d 589 [21 Cal.Rptr. 545, 371 P.2d 281], the court, relying upon subdivision (d), annulled a permanent disability award based upon maximum earnings where prior to the industrial accident the injured, a construction worker, had only worked intermittently and the earnings at the time of injury were unusually high.

Thus in *Goytia, supra,* the court concluded that "[i]f, as in *Argonaut,* the board may reduce an appraisal of earning capacity based exclusively upon postinjury earnings because of the total history of the applicant, it must by the same token possess the corollary power to take into account immediately preinjury earnings in order to increase its appraisal of such earning capacity." (*Goytia,* at p. 896.)[4]

In *Jeffares v. Workmen's Comp. App. Bd.,* 6 Cal.App.3d 548 [86 Cal.Rptr. 288], an injured part-time employee was also a student studying to obtain her teaching credential. In considering the compensation rate for temporary disability, the court held: "An intent by an injured part-time employee to work full time in the future is a factor which must be considered in determining earning capacity. . . . The fact that the injured employee is a student working part-time because of necessity to complete her educational goal in order to obtain a full-time position in

---

[4]*Goytia* also cited approvingly the Board decisions in *Dole v. Industrial Acc. Com.* (1966) 31 Cal.Comp.Cases 41 and *Esparza v. Regents of the University of California* (1966) 31 Cal.Comp.Cases 433, which considered potential future earnings in determining earning capacity. (*Goytia, supra,* 1 Cal.3d at pp. 896-897.) *Dole* involved an injured who was a part-time worker at the time of injury and later obtained steady full-time employment. *Esparza* involved a part-time student worker who but for the industrial injury would have received his master's degree within six months of the injury.

the future is a special circumstance which should be considered in predicting earning potential." (P. 552.)

Similarly, in *Pascoe v. Workmen's Comp. Appeals Bd.* (1975) 46 Cal.App.3d 146 [120 Cal.Rptr. 199], the injured employee was a nurse's aide who was studying to become a registered nurse. The injured, who had worked for the employer (a convalescent hospital) in the past, was hired on August 19, 1969, and was to begin full-time work as a nurse's aide in about two weeks. The employer also promised to employ the injured as a registered nurse at an appropriate increase in salary when the injured received her nursing license in a year's time. On August 24, 1969, however, the employer requested the injured to work a full shift in place of an aide who was ill; the injury occurred on that day while working such shift. The injured also worked a full shift on August 25, but was unable to work thereafter for the employer because of the injury. In August 1970, she received her registered nurse license; but, except for a short period in 1971 when she worked as a registered nurse for $5 per hour, the injured was unable to work because of her injury.

The court stated that section 4453, subdivision (d), applied since "[w]hether or not [the injured] was employed on a part-time or full-time basis, her earnings at the time of injury did not reasonably or fairly reflect her earning capacity as a registered nurse." (*Pascoe, supra,* at p. 153.)

*Pascoe* did not disapprove of *Moreno,* but in distinguishing it, stated "[t]hat decision has no application where, at the time of injury, the employee was actually in the process of improving his earning potential. (See *Goytia v. Workmen's Comp. Appeals Bd., supra,* 6 Cal.3d 660.)" (P. 155.)

The recent decision in *Westside Produce Co. v. Workers' Comp. Appeals Bd.,* 81 Cal.App.3d 546 [146 Cal.Rptr. 498], is instructive. There the injured employee was a seasonal worker whose employment would have ended shortly after injury. The Board awarded temporary disability based solely upon the high earnings at the time of injury even for the period after the employment would have terminated. In annulling the decision, the court first observed that "[i]n determining the earnings for purposes of temporary disability, the question is whether the injured would have continued working at a given wage for the duration of the disability." (P. 551.) The court then directed that temporary disability be based upon earnings at the time of injury only for the period that the employment

would have continued. For the period after the employment would have ended, the court concluded at page 552 that the injured worker was "entitled to temporary disability considering her past earnings history and her anticipated future earnings had she not been injured."

"Thus earning capacity at the time of injury is the touchstone of average earnings in California." (*West* v. *Industrial Acc. Com., supra,* 79 Cal.App.2d at p. 722.) In the case of nonpermanent employees (as in *Goytia*) part-time employees (as in *Jeffares*) and employees involved in educational self-improvement activities (as in *Jeffares* and *Pascoe*) section 4453, subdivision (d) permits disability awards to be based on evidence of true earning capacity including future but unrealized potential earnings.

In the ordinary and usual case of the permanent and full-time employee, the objective of facile and uniform computation is well served by the standard formula of subdivision (a)—daily earnings times days worked—in determining earning capacity.

However, we see no logical or legal basis for penalizing full-time permanent employees by "locking them into" subdivision (a) and uniformly denying them the benefits of the more flexible test of subdivision (d).

In so holding we do not suggest that in every case the Board must engage in an open-ended consideration of nonspecific or amorphous claims of future potential earning ability.

What we do hold is that where, as here, there is specific demonstrable evidence that the injured employee, would, but for the injury, have received increased earnings, the fixed formula of subdivision (a) cannot be reasonably and fairly applied, and that in such circumstances average earnings can be computed on the basis of earning capacity under section 4453, subdivision (d).

The award is affirmed.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied September 5, 1979, and the petition of respondent Kaye and the application of petitioner for a hearing by the Supreme Court were denied October 4, 1979.